Filed 1/23/26  D.H. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| D.H.,<br><br>　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>　　Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>　　Real Party in Interest. | A174597<br><br>(Contra Costa County Super. Ct. No. J2500042) |

On January 11, 2025, then six-and-a-half-year-old K.L. presented at UCSF Children's Hospital Oakland (UCSF) with a broken femur; he weighed 21 pounds and was unable to sit up on his own.  K.L. was temporarily removed from the custody of his parents, D.H. (mother) and S.L. (father), and a juvenile court denied reunification services, setting a Welfare and Institutions Code[1] section 366.26 hearing to establish a permanent placement plan for K.L.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

1

Mother, acting on her own behalf, filed a writ petition for extraordinary relief to overturn the disposition order after her appointed counsel filed a letter pursuant to *Glen C. v. Superior Court* (2000) 78 Cal.App.4th 570, explaining that counsel found no arguably meritorious issues. Although mother's writ petition fails to adequately present her arguments for appellate review, to the extent we can understand her claims, they lack merit, and we therefore deny mother's petition.

## BACKGROUND[2]

On January 11, 2025,[3] around 5:00 a.m., then six-and-a-half-year-old K.L. presented at the UCSF emergency room with a chief complaint of left leg injury; he was admitted with a fractured femur.[4]

Immediately, there was high level concern about malnutrition contributing to "a failure to thrive (starvation)." K.L. weighed 21 pounds, which is the average weight of a one year old, and was between 27 and 32 inches tall; 32 inches is the average height of an 18 month old. The average weight for a six year old would be between 60 to 80 pounds and the average height would be around 50 or 60 inches. K.L. had "[l]ong, unkempt hair which was matted towards the back of his head," and was missing several teeth; his remaining teeth were "yellow and rotting," and the white enamel "was almost gone."

---

[2] Because father did not timely file a writ petition in our court, we provide only the facts necessary to resolve mother's claims.

[3] Further dates are in 2025 unless otherwise indicated.

[4] Evidence of K.L.'s medical status was presented at a combined jurisdictional and dispositional hearing by Kelsey Merl, an expert in pediatrics and medical evaluation of child abuse at UCSF, who consulted with K.L.'s medical team.

2

K.L. was diagnosed with acute malnutrition with a concern for chronic malnutrition (malnutrition lasting longer than three months) and "life threatening re-feeding syndrome," which placed K.L. at risk for "cardiac arrhythmias." Accordingly, he was transferred to the pediatric intensive care unit for monitoring.

Medical staff initiated a broad medical evaluation to further understand not only K.L.'s leg injury but also his nutritional status. Laboratory tests indicated that K.L. was hypoglycemic (low blood sugar) and had low phosphorous, magnesium, and potassium levels. A doctor reported that K.L.'s vitamin D level was "almost undetectable," and his bones were virtually "see through" on X-rays.

An X-ray survey of every bone in K.L.'s body reflected a "severe degree" of demineralization or osteopenia, "meaning that the bones are not healthy. The bones are very sick." In addition to the femur fracture, X-rays revealed two rib fractures, which occurred "some time in the past." An "endocrinology workup" provided no "genetic explanation for the demineralization or osteopenia," suggesting that the demineralization was a result of the chronic malnutrition.

Genetic testing determined there was no hereditary cause or contributing factor for K.L.'s malnutrition, indicating that he was receiving "inadequate calories at home," and brain imaging revealed "bilateral cerebral volume loss," meaning K.L.'s "brain was shrinking in size," which was consistent with chronic malnutrition.

K.L. also presented with "abdominal distention and constipation." X-rays revealed that K.L.'s "intestines were extremely dilated, and they were filled with stool." A doctor described the X-ray of K.L.'s colon taken upon admission as "one of the top five wors[t] x-rays she ha[d] ever seen in her

3

lifetime" and indicated that K.L.'s "chronic constipation," which is commonly seen along with malnutrition, "ha[d] been going on for years."

K.L. was nonverbal and "delayed" "in almost all domains of development," including speaking, moving, walking, and using the bathroom. At the time of admission, K.L. could not sit up independently, leading to concern that his "central core was weakened," and his femur injury prohibited K.L. from being able to ambulate due in part to the associated pain. K.L. also had "significant growth and fine motor delays." K.L. lacked the "expected strength for his age in his arms" and in "his fine motor grips," which constituted "clear evidence" of gross developmental delay.

Ultimately, K.L.'s comprehensive "medical evaluation" revealed "no medical problem . . . that could have caused or contributed to his malnutrition." The hospital began feeding K.L. through a nasal gastric tube, which led to weight gain and "a near vertical line up the growth chart." Had K.L. not received medical intervention, his "trajectory" was "not sustainable with life" and possibly "fatal." K.L. was stabilized by January 24 but was still receiving "a hundred percent of his calories through nasal gastric feeds" because he "refused to take any of the oral food."

On January 12, K.L. had orthopedic surgery to repair his femur. K.L. had to "endure getting a cast without medication due to low electrolytes and not being stable" at the time. On February 7, K.L.'s leg brace was removed, and on February 10, he was discharged from UCSF after approximately 30 days in the hospital. K.L. weighed over 26 pounds and was still "taking his calories through the NG tube," which would continue "for a few months after discharge to ensure weight gain."

K.L. was placed with caretakers with a background in nursing, where he spent most of his time playing with "developmentally appropriate" toys,

4

instead of watching videos on his iPad.  He continued meeting with speech, occupational, and physical therapists regularly "to work on all of [his] different developmental concerns," however, three months after discharge, K.L. was "still getting at least the majority of [his] feeds through a tube."[5]

At a "well child" visit on May 29, K.L. weighed 35 pounds and measured just over three feet, one inch tall; he continued to have an oral aversion and issues with constipation.  By June 30, K.L. had regained mobility and was walking and running without assistance but was still nonverbal.

## I.  Investigation

After K.L. was admitted to UCSF on January 11, hospital staff called the Pittsburg Police Department to report "child neglect," advising that "a six-year-old male was near death" and "was the size of a one-year-old child." A hospital social worker had also contacted the Contra Costa County Children and Family Services Bureau (Bureau).

### A. Parent Interviews at UCSF

A social worker met with K.L. and his parents on the date of the hospital admission.  K.L. reportedly lived with mother and father, as well as K.L.'s maternal uncle, grandmother, and great-grandmother.  Mother and father were both employed, but mother was K.L.'s primary caregiver. Neither parent had any criminal or child welfare history.

According to mother, K.L. was a planned pregnancy, which occurred at home assisted by a midwife and doula.  Mother reported K.L. was born at a "healthy weight" of just over six pounds, but his weight had been "up and

---

[5] In early May, K.L. had "a gastrostomy tube (G-tube) surgically placed in him to help deliver nutrition, fluids, and medications directly into his stomach."  As of late August, K.L. was still using a feeding tube.

down . . . all his life." Mother could not recall the exact age she started giving K.L. solid food but remembered that it was before two years of age. Mother also reported that she would breastfeed K.L. because he "doesn't know how to chew."

Mother claimed that K.L. was "completely normal until four, then there were changes." By the age of four, K.L. would eat only certain foods: lentils, black beans, avocado, and banana.

K.L. did not eat meat or dairy and reportedly did not like certain textures or colors; K.L. preferred his food to be blended, which mother would feed to K.L. through a syringe six times a day because K.L. did not want to be fed with a spoon. Mother indicated that K.L. used to say a few words but was no longer verbal and "he would touch his lips to eat." Mother attributed K.L.'s lack of weight gain to K.L.'s own refusal to eat and "because he likes to breastfeed."

K.L. was homeschooled "due to having too many needs," according to mother. Mother stated that K.L. was potty trained but would wear diapers at night. Mother also described K.L. s "lazy" because he did not want to get out of bed.

Mother did not seek regular medical care for K.L. or schedule well-child exams. Mother could not explain why K.L. had not had consistent medical care but stated that she did not trust healthcare providers and liked to do her own research.

K.L.'s last doctor visit was in 2021, when he was "around the age of four." He was taken to the Kaiser Hospital emergency department in Antioch because he "ingested something," later determined to be "a strand of hair,"

and mother was concerned.[6]  At the time, K.L. weighed 14 pounds.  Prior to that visit, K.L. had been taken to Pittsburg Medical Center when he was around 11 months old and found to be a healthy weight and height and was talking.  Mother did not have any records from the visit or remember K.L.'s weight or height.  However, mother claimed that after the visit, K.L. continued to "hit his milestones and gain weight" based on K.L.'s need for bigger diapers, pants, and shirts.  Mother could not provide exact measurements and did not seek follow-up care to verify K.L.'s developmental milestones were being achieved.

The social worker "had a difficult time following mother's recollection of all the events that led to [K.L.'s] admission" at UCSF.  According to mother, around 7:00 p.m. on January 10, K.L. was "do[ing] a daily walk" around the house, which lasted for about 30 minutes when K.L.'s leg buckled.  K.L. pointed at his leg, and mother observed "bulging" and called an ambulance. Mother initially requested the ambulance take K.L. to John Muir Hospital in Walnut Creek because it was closer.  However, John Muir was not equipped to handle K.L.'s extreme malnutrition, and he was transferred to UCSF.

During his interview, father explained that K.L. "began to lose a lot of weight," but he and mother delayed taking K.L. to the hospital because they "wanted him to gain more weight" first.  Father described mother as a "healer" who had jars of herbs that she would use to cure medical issues in the family.  Father became tearful and emphasized that mother was a good

---

[6] At the combined jurisdictional and dispositional hearing, mother explained that K.L. had been "experiencing complications with eating" and neither mother nor father could "get him to eat," which had "never happened" before.  Father suggested that maybe K.L. was "choking on something," which caused the parents to call Kaiser.

parent and a good person and explained they "just didn't know how to fix it," meaning how to help K.L. get better.

After the interviews, mother and father were informed that K.L. was being removed from their custody "due to the emergent nature of the situation"; mother became visibly upset and ran to the restroom. Mother was heard screaming, "I want to die now," and was assessed for suicidal ideation, which did not require intervention; the parents were escorted out of the hospital by security.

**B. Home Visit and Follow-up Interviews**

On January 13, a social worker made an unannounced visit to K.L.'s home, where the family had lived for the past seven years. The social worker observed "various clothing items strewn about the room" where K.L. and his parents slept, but otherwise found the home to be free of hazards and with working electricity, running water, and an adequate amount of food.

During the home visit, the social worker interviewed the family members present, including K.L.'s maternal grandmother, great-grandmother, and uncle, and conducted second interviews with mother and father.

In her second interview, mother described K.L. as "high energy" and "very active," as evidenced by being potty trained since the age of one. Mother explained that K.L. would share a bed with father and her and could "get down from bed and go to the potty on his own." Otherwise, K.L. would point so that either parent could take him to the potty, which was kept in their shared bedroom. Mother also claimed K.L. could use the regular sized toilet in the bathroom.

Mother denied that K.L. had any issues of concern and denied medical staff mentioning malnourishment; she instead represented that K.L. had

8

been kept in the intensive care unit at UCSF because he needed a cast for his leg. Mother did not believe K.L. was underweight, asserting that he was previously "chunky" around three years old before he started to "slim up and come into 'his own look.' "

Mother reiterated that K.L. was a "picky eater, especially relating to texture and certain foods" and claimed to have the ability to "understand his needs and address them through research and holistic practices" such as supplements.[7]

When asked about K.L.'s dental problems, mother stated that she brushed his teeth daily but was concerned that K.L. might be autistic since he was reluctant to open his mouth, which mother attributed to sensory issues. The social worker asked again how K.L.'s teeth had become so damaged, and mother claimed that she had only gone two days without brushing them. Mother similarly claimed that she trimmed K.L.'s nails "about every two weeks, and it has to be done in his sleep due to the sensory issues that autistic kids have." The social worked asked if K.L. had ever been assessed for autism, to which mother replied, "not yet."

The social worker expressed concern about K.L.'s size, and mother stated that she "thought it 'was genetic, cause me and his dad have always been small.' " When the social worker asked about a six year old breastfeeding, mother claimed she did not breastfeed K.L. daily and it was mostly after he eats "that he will come up to her and 'bite down and maybe suck for about three seconds.' " Mother understood breastfeeding to be " 'more of a comfort thing.' "

---

[7] The social worker observed a small mason jar labeled "Nettle 7/10," and two bottles labeled "Child Life Liquid Vitamin C" and "Child Life Liquid Multi-Vitamin and Mineral." Mother also had "journals with pages of holistic cures and herbs that can cure different diseases."

Regarding K.L.'s leg fracture, mother explained that K.L. "was getting up to go for a walk" and "slid down the bed and took several steps without assistance, into the hall before his leg buckled, he fell to the floor and grabbed at his leg." Mother immediately called 911.

Father was interviewed for a second time and described K.L. as healthy, active, and "high energy." When asked about K.L.'s broken femur, father explained that he was in the room with K.L. and told him, "it was time to walk." K.L. "stopped watching his show and then slid down the bed and walked toward the hallway." Father pointed to the edge of an orange rug as the place that K.L. "fell down and then pointed to his leg."

K.L.'s maternal grandmother described K.L. as "an active, high-energy child who could 'tell you his colors and numbers,'" which the social worker noted "was not observed by any medical professionals" and was "inconsistent with [K.L.'s] current non-verbal presentation." K.L.'s grandmother stated that she was not "overly concerned" with his weight "as she thought it was related to genetics."

K.L.'s maternal uncle described K.L. as active and stated they spent a lot of time together walking around the house, reading, and watching television.

**C. Recommendation**

Based on K.L.'s severe malnutrition and its investigation, the Bureau was concerned about mother and father's "ability to assess and act upon the needs of [K.L.]" and noted that mother and father lacked an "understanding of the severity of their child's injuries, failure to thrive, and urgency to [the] issues surrounding [his] safety and wellbeing." Thus, the Bureau recommended that a welfare petition be filed on behalf of K.L. and that he

remain detained from his parents' custody pending a decision of the juvenile court.

## II.  Jurisdiction and Disposition

On January 14, while K.L. was still hospitalized, the Bureau filed a juvenile dependency petition, asserting the parents failed to protect K.L. from "serious physical harm or illness" (§ 300, subd. (b)(1)) and had subjected K.L. to "acts of cruelty" (§ 300, subd. (i)).

At a detention hearing on January 15, the juvenile court appointed counsel for K.L. and his parents and removed K.L. from his parents' custody, finding there was a "substantial danger to the physical health" of K.L. and "no reasonable means" to protect him without removal.  The court permitted supervised visitation of one hour per week.

On February 5, the court authorized the release of K.L.'s protected health information to the Bureau for healthcare treatment because the "Parents refused to sign" the release form.  Mother claimed, "she did not have her counsel present" when asked to sign, "and she also wanted to make sure she can also receive copies of whatever they received."

On February 19, the court continued the jurisdictional hearing without objection, so the parties could review the recently produced Pittsburg Police Department report.

After an in camera hearing on April 22, the juvenile court appointed a guardian ad litem for mother.  Mother also made an oral *Marsden*[8] motion, challenging her appointed attorney, which the court denied.

---

[8] Pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), a defendant may seek substitution of appointed counsel " 'if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable

11

## A. Jurisdiction

On April 23, a contested combined jurisdiction and disposition hearing commenced.  In its jurisdictional and dispositional report submitted to the court, the Bureau recommended that K.L. be adjudged a dependent of the court; that reunification services be denied pursuant to section 361.5, subdivision (b)(6);[9] and that a section 366.26 hearing[10] be set "to determine the most appropriate permanent plan" for K.L.

According to its report, the Bureau recommended denying reunification services because it was "evident" that K.L.'s parents knew his health was "struggling, and they did not act with urgency to get them the help he needed, which caused his condition to worsen and if they would have waited any longer it may have resulted in [K.L.'s] death."  The Bureau did not believe it was in K.L.'s best interest to be reunited with his parents because, despite all the medical diagnoses and explanations, "the parents are still refuting the idea that there is anything wrong with him, and they choose to believe that the professionals are lying about [K.L.'s] health."

---

conflict that ineffective representation is likely to result.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 599.)

[9] "As a general rule, when a child is removed from parental custody under the dependency laws, the juvenile court is required to provide reunification services to 'the child and the child's mother and statutorily presumed father . . . .' " (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1120.)  Reunification services may be denied pursuant to certain statutory " 'bypass' provisions," including, as relevant here, when there is clear and convincing evidence of "infliction of severe physical harm" upon the child.  (*Id*. at p. 1121; § 361.5, subd. (b)(6)(C).)

[10] The purpose of a section 366.26 hearing is to select and implement a permanent plan for the child after reunifications efforts have failed or been denied.  (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852.)  Juvenile courts may select one of three alternatives:  adoption, guardianship, or long-term foster care; adoption is preferred.  (*In re A.S.* (2018) 28 Cal.App.5th 131, 152.)

### 1. *Police Interviews*

The Bureau's updated report proffered testimony from Pittsburg Police Department officers who interviewed the parents and first responders after K.L. broke his femur.

Mother decided to have a home birth because she had "a bad experience at Kaiser, due to them not allowing her to do the water birth to her specifications." "Kaiser would allow her to be in a tub with water but as soon as the contractions started, she was to be removed from the water."

Mother also felt that Pittsburg Health Center, where she took K.L. at 11 months old, was "horrible and doesn't like it." Mother claimed she made an appointment at Pittsburg Health Center for K.L., but when she called the hospital after making the appointment, it "claimed they did not have [K.L.] in the system, so she decided not to [go to] the appointments." The interviewing officer followed up with Pittsburg Health Center, which stated that medical staff had called mother and scheduled a follow-up appointment; however, mother never took K.L. to the appointment. Mother also expressed concern "about John Muir because she has heard about Black people dying there."

According to mother, K.L. "never spoke much," his vocabulary never exceeded 10 total words, and he had never formed full sentences. Mother claimed that K.L. was "chunky with big cheeks" in 2023, and "weighed way more than he weighs now (20lbs) and was probably around 40lbs." The investigator noted that would mean K.L. lost half his body weight since 2023.

Mother claimed that she wanted "someone who can help her, and not tell her she is doing anything wrong, because she knows she is doing everything right." However, "when she goes to certain doctors or places, she can feel the energy of their message towards her," so "[s]he doesn't feel she can get help at certain places" and "branches out."

Mother explained that she fed K.L. "a holistic vegan diet" and would "keep[ ] track" of K.L.'s meals on "a nutritional board" that was "mixed with information she researched on Google." Mother also received "a lot of help from Holistic Doctors."

In his interview with police, father described mother as "a very holistic person," telling officers, "[they] don't even know the half of it." Father believed "the holistic approach is amazing, because natural herbs and remedies can fix and heal diseases and other aliments," but he did not "really follow the holistic pescatarian diet" and described himself as "a picky person," preferring to eat foods like "McDonalds, chicken, meatloaf, [and] spaghetti."

Officers also interviewed the responding paramedics and emergency medical technicians. First responders described the family's apartment as "disheveled and not particularly clean" and "rationalized" K.L.'s "condition and size by what the parents told them about the multiple diseases and condition[s] the child was suffering from." Mother told first responders that K.L. "regularly" went to Pittsburg Health Clinic. However, when "questioned further about the hospital the child went to on a regular basis, she was vague and could not recall the name of the hospital and just pointed towards the City of Antioch."

"The parents were insistent upon going to John Muir Concord despite [first responders] recommending they go to [UCSF]." A paramedic "was eventually able to convince them to go to Oakland" because the paramedic believed UCSF provided "the best possible care," however, "while they were en route the mother (in the ambulance) called the father on the phone and . . . then changed their mind . . . and wanted to go to John Muir Concord."

14

## 2. *The Bureau's Witnesses*

At the hearing, Kelsey Merl, an expert in pediatrics and medical evaluation of child abuse, testified in person on behalf of the Bureau.

Using UCSF's electronic records system, Merl was able to access and review K.L.'s past medical records from his earlier visits to Pittsburg Health Center in 2019 and Kaiser in 2021. At K.L.'s first visit to Pittsburg Health, he was 11 months old and weighed 17 pounds, which was below the fifth percentile of comparable children. At his visit to Kaiser in 2021, K.L. weighed 14 pounds; he had lost three pounds between the ages of 11 months and three years old. Merl explained, "Children should never ever lose weight. Sometimes they might drop percentiles, but they never lose weight."

Merl was "concern[ed] for [K.L.] that he will never be the boy that [he] was meant to be, and that's because of the chronic malnutrition." Records from K.L.'s first visit as an 11 month old reflected that "he was developmentally meeting all of his milestones," but by six and a half years old, "he was not meeting those milestones" and had "really significant gross fine motor delays" and speech delays. Merl explained that "children with chronic malnutrition are in a constant state of survival," which can lead to "developmental delays" and "significant mental health concerns."

Merl noted "conflicting information" in the medical records about K.L.'s life "in the minutes, hours, days, months, years leading up to admission" at UCSF. "There were some statements that said he was completely normal until four, then there were changes. There were some statements that just six month ago there started to be changes."

Merl described a January 24 visit with a UCSF feeding specialist, who asked the parents to "bring everything they use to prepare [K.L.'s] meals, as they wanted to observe how he was being fed because what the parents were

reporting was inaccurate to what [K.L.] could do in the hospital." K.L.'s parents brought in their "home foods" and "home blender" and "prepared the food with hospital staff" but "did not provide measurements to anything they prepared. When they tried to feed it to [K.L.], he pushed it away." His parents claimed that K.L. loved to eat and was receiving "two cups of puree three to five times a day," which did not correlate with K.L.'s presentation "in terms of malnutrition status at the time of admission."

On cross-examination, mother's counsel questioned Merl regarding the "symptoms" associated with "mold exposure." Merl explained there was no "documentation with that concern" in K.L.'s medical records, "nor did the parents seek medical care with that concern"; however, mold exposure "can cause a lot of different problems, like respiratory problems, [and] immune system problems."

In the afternoon of April 23, after Merl was excused as a witness, mother's counsel made an oral motion to continue the hearing because mother had provided counsel with "a document," which mother represented was "indicative of her having black mold and additional forms of mold inside of her home where [K.L. had] been living since birth."

The court declined to stay the proceedings, noting that the evidence "would be, if relevant, more relevant to an issue of disposition and bypass as opposed to jurisdiction." The court expressed concern regarding foundation and whether mother would testify given the pending criminal charges but permitted counsel to "develop evidence and argument on the issue of disposition."

The Bureau proceeded to call Yecenia Parra, a social worker, to testify. Parra had been assigned to K.L.'s case "[s]ince late January of 2025," and explained that mother "doesn't understand and believe that [K.L.'s] medical

16

health is as severe as the medical team describes it to be." Parra noted "inconsistencies" in mother's explanations, where mother would say one thing and then later "contradict herself and say she didn't say that."

"At times," mother was argumentative with Parra. Mother lacked the "ability to listen and understand" the information being provided and was not "accepting of it." Because mother was "in denial of the child's condition," "it became difficult" to explain K.L.'s needs; mother "would be in denial or say, It didn't happen, or just say something completely different or go on tangents."

After Parra's testimony, the Bureau had no further witnesses. Mother's counsel renewed her request for a continuance to review mother's purported mold evidence, noting "the potential that [mother] would testify." The court and parties agreed to continue the hearing to May 14, which was later continued to June 20.

### 3. *Interim Proceedings*

On April 30, the juvenile court granted the Bureau's ex parte application for consent to sedate K.L. in order to perform medical procedures that required anesthesia, including a surgical biopsy to evaluate for Hirschsprung disease.[11] Although mother and father indicated they would consent to the procedures and sedation, they wanted the procedures delayed to celebrate K.L.'s birthday.

On June 18, the juvenile court held an in camera hearing with mother, her appointed counsel, and her guardian ad litem. Both mother's counsel and guardian ad litem sought to be relieved from representing mother. The court reviewed otherwise privileged e-mail communications between mother, counsel, and the guardian, where mother copied her "advocate," a third party

---

[11] Hirschsprung disease "affects the rectum" and testing requires a "rectal biopsy, which has to be done when the child is under anesthesia."

17

identified only as "Solomon Daughters."  The court agreed that that the communications reflected "an effort to interfere with the attorney-client relationship, as well as the ability of the guardian ad litem to serve in that capacity," but denied the request to relieve their representation "at least through jurisdiction."

### 4. *The Bureau's Supplemental Memorandum*

In advance of the June 20 continued jurisdictional hearing, the Bureau prepared a supplemental memorandum, which was offered for both jurisdictional and dispositional purposes.  As of June 12, "the parents have still not provided any information pertaining to the request [for] the dispositional interview."  "The Bureau has also not received any additional information regarding medical records or reports from their home being investigated for the mold."  Further, mother was causing "confusion and disruption" at K.L.'s medical appointments.

Regarding K.L.'s asserted autism, on June 10, the social worker provided the parents with a questionnaire from the Regional Center of the East Bay "and requested they fill it out immediately."  Mother claimed that the assessment would take eight weeks to complete, "and they want[ed] to expedite the process by scheduling a medical appointment 'by his primary care physical [*sic*] through our insurance provider.' "  The social worker contacted K.L.'s pediatrician for "a diagnosis of autism"; K.L.'s pediatrician "confirmed she cannot do that and suggested he be referred out to a behavioral specialist."  It ultimately took the parents over a month to complete the form and, as of October 2025, K.L. was still on the waitlist to be assessed due to the parents' delay.

The Bureau noted the parents' "continued pattern of behavior" in refusing to cooperate and provide necessary information; instead "prefer[ring]

to seek out their own medical provider and get a different response," which "caused [K.L.] to be medically neglected in the first place, and it is evidence the parents have not changed."

At the June 20 hearing, the Bureau rested its jurisdictional case; K.L.'s counsel presented no additional jurisdictional evidence.

### 5. *Mother's Evidence*

Mother was then advised of and waived her constitutional right to remain silent, and was sworn as a witness. Mother stated she never intentionally harmed K.L. and understood the concerns regarding his condition at the hospital on January 11. She explained that K.L. "was removed because he . . . wasn't receiving care from a medical doctor on a consistent basis, and he was malnourished from that." Mother believed she "wasn't in the right mental state to be able to recognize what was wrong" and was "fearful of what [she] was being taught," which made her "have the wrong state of mind as to taking [K.L.] to seek help professionally."

According to mother, she had experienced morning sickness during her pregnancy with K.L., which her OB-GYN attributed to "the food [mother] was eating" and provided a meal plan. However, the meal plan did not help and "continued to make [mother] sick." Mother then reached out to "Nature Boy," "someone [she] met online in 2015," who provided a meal plan when mother was in her second trimester. The meal plan worked in stopping mother's morning sickness, and she gained "over 25 pounds," which her OB-GYN had "directed" her to do "to be able to have [K.L.] in a healthy manner."

Nature Boy, whose real name was Eligio Bishop, was the "leader [of] a cult. The cult's original name was Melanation." Mother had joined Melanation before her pregnancy with K.L. and "didn't see it as a cult" at the time; father did not follow Melanation.

19

Nature Boy "would offer advice on how to live through the land and how to receive direct . . . health through the earth and through God." Mother explained she "was into the lifestyle of living for and through God and living the natural ways of a righteous life," which "means you do everything in direct respect to and of God."

Nature Boy provided mother a meal plan for K.L. when he was three years old, prior to which, K.L. was breastfeeding and eating "raw foods that were pureed. Raw vegan foods," like fruits and vegetables. Because Nature Boy's meal plan made her "very healthy," mother "thought it would be very health for [K.L.] to receive a meal plan from him as well."

When K.L. was around three and a half, he "became more picky with the meal plan that was provided by [Nature Boy]," so mother started giving K.L. vitamin supplements that she purchased from Target to ensure K.L. received his "full nutritional value." When questioned about K.L.'s purported weight fluctuation, mother explained she "changed his diet like three times," including "Dr. Sebi's diet," "a Rastafarian diet," and "a kosher diet," all of which were suggested by Nature Boy.

Mother testified that K.L.'s hair had never been cut "Due to our religion," in which "we do not cut boys' hair." Mother believed if boys' hair was cut, "they will become weaker." The same applied to cutting boys' nails. Mother claimed she bathed K.L. "[e]very single day," and if his nails needed to be cut, they would cut them on a Monday," which was "in direct respect of [K.L] and his boyhood and him being a godly being."

Mother homeschooled K.L. "using [a] Montessori curriculum," which she received from "one of [her] sisters that was in the house living alongside

[Nature Boy]."[12]  "[A]fter the age of four," there was "a slight change in [K.L.'s] speech" when he "went from using three-word sentences to one-word sentences.  Sometimes two words."  Mother noticed the change because "the curriculums" included "tests to see what words [K.L.] would still be willing to say and what words he wouldn't."

Mother did not have K.L. professionally "assessed" because "[t]he ladies in the house always recommended that . . . if [mother] had any problems with anything . . . , [she] should switch curriculums."  Nature Boy also told mother, "never to take [K.L.] to see a traditional doctor" because "they could possibly harm him or take him away from [mother] entirely."  Mother could "see now" that this advice "led [her] to be highly fearful, highly resistant."

By the end of 2024, mother "began to seek out help to relieve [herself] from having that mindset that . . . [Nature Boy] introduced [her] to."[13]  In December 2024, mother started working with a "counselor" that she found and was following on social media.  Mother watched the counselor's videos, in which she would post about "healthy eating" and "politics"; mother "was already into" these topics "because [she] was coming out of the cult."

During their weekly phone calls, the counselor would "deprogram[ ]" mother's "mindset" so she "wasn't so fixated in the mindset that I had that led me here."  Mother did not pay the counselor, who mother believed had

---

[12] The sisters were not mother's "biological" sisters, but rather "women that have respected [mother] throughout [her] pregnancy" and "provided [mother] with a lot of information on the ways of clean living, clean eating and a clean way of being."

[13] Mother testified that she was a member of Melanation until 2022, and then from 2022 to 2024, she "joined another group"—"Love and Light," which "was also a cult."

21

"credentials," meaning, "[s]he has like her license to counsel. I believe she went to college for it."

Mother claimed she became aware in February 2025 that the apartment where she and K.L. lived had "multiple variations of mold toxicity. Including black mold." Mother had "mold professionals come out over three times to test for different variations of molds. They found multiple variations of mold each time. [¶] The final time . . . they came to the apartment, they found a large amount of black mold."

On redirect examination, mother testified that the testing company was called "Mold Consulting"; however, objections to subsequent questions regarding any impact of the mold and to the introduction of the testing report were sustained.

Mother continued testifying on June 30, and on cross-examination, she admitted that her "legal advocate" was also her counselor, "Miriam Banks." Mother explained that her advocate Banks had "been helping" "since this whole process started with my son"; mother had "called her right after my son broke his leg." Mother was on the phone with the advocate in the ambulance when she decided to take K.L. to John Muir over the paramedic's advice to go to UCSF, "because it was the fastest option."

Although the advocate was not a lawyer, she had been helping mother through the dependency proceedings by providing "information" when mother could not reach a social worker. Mother admitted to having the advocate on a phone call with Parra and that the conversation "didn't go well." According to mother, Parra was discussing reunification services and "the conversation got kind of like heated," with Parra and the advocate "both kind of talking at the same time." Ultimately, the advocate used profane language, and Parra ended the phone call.

Later, mother claimed that K.L. could "play, dance," and "was active" up until right before he broke his leg and that K.L. "would dance in the living room" on his own the week before he was removed. When asked why she described K.L.' as "lazy" to police, mother clarified that she "was explaining to the police officers that my son would have times where he would like to stay on the electronics," and she "didn't know if that was due to like laziness or what."

Mother also acknowledged that K.L. was experiencing extreme constipation. Mother suggested "avocados can make you backed up," and that K.L. "had just had avocados" before breaking his leg.

At the continued hearing on July 30, mother' counsel dismissed her as a witness, and Parra, the social worker, was recalled for cross-examination. Mother's counsel attempted to introduce evidence by way of "Delivered Service Logs"—which is a document of "medical information for the child" "entered by public health nurses"—that indicated a "physical therapist" noted K.L. might suffer from spastic diplegic cerebral palsy. However, Parra did not author the entry and had no knowledge of K.L. being diagnosed with cerebral palsy; the court sustained the Bureau's and K.L.'s counsel's objections to the testimony. The court admitted the delivered service logs into evidence, but cautioned that "there's no information or evidence to suggest [the note regarding cerebral palsy is] in any way related to the allegations in the petition" or "the cause of [K.L.'s] condition at the time he was removed from the home."

On redirect, Parra testified that mother had never mentioned that she was involved in a cult or that she was influenced by Eligio Bishop, i.e., Nature Boy. Parra also provided her recollection of the phone call with mother and her "advocate." Mother and her advocate had called Parra on

23

"three way." Mother "stated that she was confused and said [Parra] wasn't explaining the case to her. And then began to proceed to ask very basic questions."

Parra attempted to explain the Bureau's dispositional recommendation to mother, but "the advocate interrupted and began to . . . bad mouth the agency; that we were not supporting her; that we were not helping her. And she began to raise her voice and yell at me." The advocate "continued to then curse at [Parra]," at which point Parra said that she "would end the phone call because I was not going to allow [the advocate] to speak to me that way. So the phone call ended."

### 6. *Jurisdictional Findings*

After hearing closing arguments on July 30, the juvenile court sustained the petition in its entirety, finding the "evidence in this case is overwhelming."

The court expressed "concerns about, quite frankly, the veracity of [mother's] claims, of membership in a cult" and found it "amazing . . . the number of discrepancies . . . between [mother's statements to law enforcement and social workers] and then what was just testified to by Mother on the stand." For example, the court pointed to mother's claim that "John Muir kills black people," which was "contradictory" to her instructions for the ambulance to take K.L. to John Muir over UCSF, finding the "internal inconsistency . . . really undermines Mom's credibility."

The court was "deeply concerned" that mother had not "come to terms with her mistrust in Western medicine," given her claims to social workers "about unfounded medical issues [that] are being attributed to [K.L.]" "Mother's testimony that she's now realizing the error of her ways [was] not at all believable to the court. I don't believe Mother has owned any of this at

24

all." Ultimately, the court found "that the evidence shows that the result of this profound abuse and neglect was cruel and to inflict cruelty on this child."

The court continued supervised visitation, which it increased to 90 minutes if both parents were visiting together; otherwise, visitation would remain at one hour per parent when visiting individually.

**B. Procedural History**

On August 6, the court held another in camera hearing with mother, mother's counsel, and mother's guardian ad litem. Mother's counsel and guardian both requested to be relieved, and mother joined the request. According to mother's counsel, mother kept involving "her advocate" in "confidential proceedings," and the advocate had threatened to sue mother's counsel and mother's guardian for defamation "based on information that [mother] had given her."

The guardian ad litem submitted e-mails from mother and the advocate that show mother's "distain" and "disappointment[ ]" with the guardian and counsel's representation. Mother stated she had consulted with "other attorneys," who "think you guys are doing a terrible job" and "sabotaging my case."

The court granted the request and relieved counsel and the guardian ad litem, finding mother's threat of litigation and overall "distrust at this point is just such that it's no longer tenable."

New counsel and a guardian ad litem were appointed on August 13, at which point the court denied mother's request to represent herself. The court also authorized sedation for K.L. to undergo a dental procedure.

The Bureau submitted another ex parte application, which the court granted on September 3, seeking written authorization for K.L. to receive "a flexible sigmoidoscopy exam under general anesthesia and rectal botox

25

injection," both to help with K.L.'s "chronic constipation."[14]  Mother refused to consent because she felt "like you guys are trying to kill my son" and claimed that K.L.'s "gastro issues . . . and everything he's going through" resulted from mold exposure at their apartment.

Before granting the ex parte application, the court expressed that it was "deeply, deeply concerned" with the parents' behavior, which "underscore[d] the court's findings following the completion of the jurisdiction trial."  The court found it "astonishing," "given the very objective nature of the evidence presented as it relates to [K.L.'s] physical state," that mother could claim "her child was fine when he was taken into care and all of his current ailments are due to the [Bureau] taking him into care and the medical treatment he's been provided."

On September 18, the juvenile court held a *Marsden* hearing at the request of mother and father's counsel "with respect to [their] representation."  Mother and father both requested new counsel and, alternatively, to represent themselves.  Beginning with the self-representation requests, the court questioned mother and father about their education and understanding of the proceedings before conducting in camera proceedings.[15]

During the in camera hearing, the court noted that mother "continue[s] to be assisted by a guardian ad litem," which "brings up explicit issues of

---

[14] The Bureau had "initially requested" that the procedures be done at the same time K.L. was sedated for his earlier surgical biopsy, but "because the parents did not agree," K.L. would "need to be put under general anesthesia again."

[15] The court conducted separate in camera hearings with each parent. Because father did not timely file a writ petition, we do not discuss father's request.

competency." The court stated that it "cannot allow you to represent yourself when there are competency issues." The court also noted that it had granted mother's prior *Marsden* request and appointed new counsel and a new guardian ad litem, which represented mother at the current hearing.

After hearing from mother, counsel, and the guardian ad litem, the court expressed concern that "We've travelled this road before with other counsel and guardian ad litem." While presented in terms of "a lack of understanding," the court believed the crux of the issue was "simply a profound disagreement with everything," and that there was no counsel "who could be appointed at this point that would satisfy" mother.

Therefore, given the "grave concerns about competency," the court denied mother's request to represent herself. The court likewise found "there is not a sufficient breakdown in communication or conflict to warrant relieving counsel and guardian ad litem," noting that both counsel and the guardian were "highly qualified."

On September 24, over the "strenuous[] object[ions]" of K.L.'s parents, the juvenile court temporarily appointed K.L.'s foster parents as his educational rights holder because K.L.'s parents refused to sign an individualized assessment plan for K.L. or release the medical information required for K.L. to enroll in school.

**C. Disposition**

The dispositional phase of the contested hearing started on October 6. In advance of the hearing, mother and father submitted requests for reunification services; counsel for the Bureau and K.L. submitted briefs in support of denying reunification services. The juvenile court also considered the Bureau's reports and ex parte applications submitted to date.

Before calling the first witness, mother's counsel made an oral motion to continue the hearing for mother to obtain private counsel and a renewed motion for mother to represent herself. Mother claimed she had "new witnesses that have not been vetted" and "submitted a toxicology screening assessment" to counsel "for the first time" "about 15 minutes ago"; the assessment was dated July 21. The court denied both requests, explaining that it had already denied mother's request for self-representation and finding that mother had "more than ample time to retain private counsel."

### 1. *The Bureau's Evidence*

The Bureau called Parra, the social worker, to testify regarding its request to bypass reunification services.

Parra explained that communications with mother "often lead to [Parra] being accused of something." Parra testified to e-mails from mother, where mother accused Parra "of colluding with the foster parent[s]" and claimed the Bureau was "trying to kill" K.L. "to solve" his case.

Parra also believed that mother feigned a lack of understanding as a delay tactic. According to Parra, "on multiple occasions," mother would claim that "she did not have [enough] information" to provide consent or to sign a document. For example, the parents would not "agree to any medical procedures" until speaking with medical staff, and once they spoke with staff, the parents "still refuse to agree to" the procedure, forcing the Bureau to seek ex parte relief.

Parra also did not "believe that the parents understand how medically challenged [K.L.] is." At visits, mother would repeatedly ask K.L. if he wanted to eat despite being "informed multiple times" that K.L. could not eat solid food and was fed through a nasogastric tube.

28

Accordingly, "The Bureau [was] worried about [the parents'] ability to follow through with [K.L.'s] needs, both educationally, developmentally and medically. They are not again understanding the severity. They believe he is a different child with different abilities. They're not believing what the medical professionals are saying. They're in complete denial of any procedure he has."

On October 8, the contested dispositional hearing continued. Parra noted an incident in August 2025 at UCSF when mother, a foster parent, and medical staff were discussing a dental procedure K.L. had just completed. Mother began asking questions about cerebral palsy, which "was information irrelevant to what [K.L.] had gone through." The foster parent tried to "redirect" mother and asked her to "please just ask questions about this and not about other stuff." Mother became upset and left the room to tell father, who "came into the room to confront the foster parent." The "foster parent felt threatened and asked for security to escort them out."

Parra explained that while doctors were "trying to determine if there's developmental disabilities as well," it felt like the parents wanted "to blame" K.L.'s condition on the alleged disabilities "instead of him being severely malnutritioned." Parra believed that K.L.'s parents "don't believe that [K.L.] is malnourished. They don't accept that. And they almost don't understand or support all the procedures that he requires because they don't understand the [truth]" about his condition.

### 2. *Mother's Evidence*

Mother called two social workers as witnesses: Lynngenia Carruth and Jared Kitchen. Carruth was assigned to K.L.'s case in late February 2025 and supervised "[o]ver a dozen" visits between February and the end of August 2025. Kitchen, also a social worker, took over from Carruth and

29

observed three visits.  Both testified the visits generally went smoothly and without any cause for concern.

The contested dispositional hearing concluded on October 9, and the court heard closing argument.

### 3. *Dispositional Findings*

On October 15, the court adopted the Bureau's recommendations, finding clear and convincing evidence supporting the removal of K.L. from parental custody and the denial of reunification services.

The court was guided by "key pieces" of evidence, namely, "the medical evidence and the statements and conduct of the parents."  Medical evidence established that K.L. "was not getting adequate calories at home, and that it was a chronic condition."  However, since his removal, K.L. "is now able to walk," has gained "significant weight," and "is barely recognizable" as compared to pictures of K.L. taken upon admission to UCSF.  K.L.'s "broken leg actually saved his life."

The court also found that "Mother appears delusional" about K.L.'s past and current condition.  In numerous e-mails, mother "continued to refus[e] to work with the [Bureau]" and "complete[ly] fail[ed] to demonstrate any capacity to accept the responsibility for what [she had] done."  Thus, "there is little to no likelihood that [K.L.] may be safely returned" to his parents' custody.

The court set a section 366.26 hearing for February 11, 2026.

### III.  Writ Petition

On October 15, mother and father filed notices of intent to file a writ petition pursuant to California Rules of Court, rule 8.450.  Counsel for both mother and father subsequently filed letters, stating counsel had reviewed the record, researched potential legal arguments, and found no "arguably

30

meritorious issues" such that counsel would not be filing a writ petition for mother or father. In response to counsel's no-issue statements, we permitted mother and father to file petitions on their own behalf. Mother filed a writ petition,[16] but father did not, which "preclude[s] any subsequent review . . . of the order setting a [section 366.26] hearing."

We ordered the Bureau to show cause, by December 15, why mother's petition should not be granted; thereafter, the Bureau requested an extension of time to show cause until January 6, 2026, which we granted.

## DISCUSSION

To start, mother's writ petition fails to adequately present her arguments for review and does not comply with California Rules of Court. (Cal. Rules of Court, rule 8.452 [providing requirements for a writ petition to review an order setting a section 366.26 hearing]; *Glen C. v. Superior Court*, *supra*, 78 Cal.App.4th at p. 583 ["at a minimum, [a petition must] adequately inform the court of the issues presented, point out the factual support for them in the record, and offer argument and authorities that will assist the court in resolving the contested issues"].) However, given the important interests at stake, we exercise our discretion to address the substance of mother's arguments but, to the extent we can understand them, we find mother's claims meritless. (*People v. McCullough* (2013) 56 Cal.4th 589, 593 ["neither forfeiture nor application of the forfeiture rule is automatic"].)

---

[16] We ordered mother to file any writ petition by November 25. Mother filed her writ petition on November 26; however, mother concurrently submitted a declaration, stating she had technical difficulties filing her petition on November 25. Therefore, we ordered mother's petition filed nunc pro tunc, rendering it timely filed.

31

# I. General Appellate Principles

We generally review a juvenile court's dispositional order removing a child from parental custody for substantial evidence. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.) When the court denies reunification services, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

However, under either standard of review, "The juvenile court's judgment is presumed to be correct, and it is appellant's burden to affirmatively show error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error." (*Id.* at p. 408.)

In a combination of handwritten and typed pages, mother makes conclusory claims of "Ineffective Assistance of Counsel," "Judicial Bias" "Suppression of Evidence," and "Social Worker Misconduct," without any reasoned explanation or analysis. All of mother's arguments are either one or two sentences, and none contains any citations to the record or case law. For instance, mother asserts counsel "suppressed witnesses, failed to investigate, failed to contact critical medical specialists," and otherwise failed to "introduce medical records, environmental testing, expert findings, or genetic evidence." Mother never identifies which counsel (former or current) rendered inadequate representation, what specific information counsel failed to investigate or introduce, or even the applicable standard of review for her claim. (*Ewald v. Nationstar Mortgage, LLC* (2017) 13 Cal.App.5th 947, 948 [failing "to articulate the standard of review on appeal [is] in and of itself a

potentially fatal omission"].)  Mother's bare "list of complaints" does not adequately present her argument for appellate review.  (*In re M.V.* (2025) 109 Cal.App.5th 486, 518 [rejecting mother's due process challenge for inadequate briefing].)

Further, our review is "limited to matters in the record."  (Cal. Rules of Court, rule 8.452(b)(1); see also *In re Zeth S.* (2003) 31 Cal.4th 396, 413 [improper for appellate court to consider "postjudgment evidence of changed circumstances in an appeal of an order terminating parental rights"].)  In addition to her writ petition, mother submitted several pages of unlabeled documents, consisting primarily of electronic communications between mother, her counsel (former and current), and the guardian ad litem.  It is not clear that any of these documents were before the juvenile court and, even if they were, mother's failure to discuss the attachments leaves us guessing as to their import or relevance to her arguments.[17]  (*In re Phoenix H.* (2009) 47 Cal.4th 835, 845 [" ' "An appellate court cannot assume the task of discovering the error in a ruling" ' "].)

Ultimately, mother's failure to support her appellate claims with record citations, cogent argument, or legal authority subjects them to forfeiture.  (*In re Phoenix H.*, *supra*, 47 Cal.4th at p. 845 [" ' "Contentions supported neither by argument nor by citation of authority are deemed to be without foundation

---

[17] The Bureau moved to strike the attachments to mother's petition, which mother opposed.  In support of her opposition, mother submitted the declaration of "Marion J. Merriouns," who claims to have witnessed the suppression of evidence.  We deny the Bureau's request to strike mother's attachments to the writ petition because even considering the attachments and the Merriouns declaration, mother fails to show reversible error.  We grant the Bureau's request to augment the record to include the Bureau's exhibit Nos. 1 through 5, which were admitted into evidence at the jurisdictional and dispositional hearing.  (Cal. Rules of Court, rule 8.155(a)(1)(A).)

and to have been abandoned" ' "].)  Nevertheless, we endeavor to address mother's arguments on the merits and conclude that none of her claims requires reversal.

## II.  Mother's Arguments

We discern five issues raised in mother's petition:  (1) denial of due process; (2) ineffective assistance of counsel and/or attorney misconduct; (3) judicial bias and/or misconduct; (4) evidentiary error; and (5) social worker misconduct.  Nothing in the record supports any of mother's claims.

### A. Due Process

Mother contends that "Structural errors occurred throughout the proceedings that fundamentally comprised the fairness and constitutionality of the case, requiring reversal."  We disagree.  In a dependency case, due process entails "the right to a hearing, the right to notice and an opportunity to present objections," and a "parent in a dependency proceeding has a due process right to confront and cross-examine witnesses."  (*In re Cole C.* (2009) 174 Cal.App.4th 900, 913.)

Here, the juvenile court heard multiple days of evidence while mother was present and represented by counsel (in fact, two different counsel). Mother offered documentary evidence, called and cross-examined witnesses, and even testified herself.  Mother's counsel made seemingly appropriate objections and presented closing arguments based on the record.  Thus, mother fails to demonstrate structural error (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1073, 1076–1077 [failure to appoint counsel or provide for father's presence at the combined hearing was "quite serious" but not structural error]) and, based on our review of the record, we fail to see any due process violation.  (See *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1080– 1081 [due process satisfied where hearing conducted, written evidence

received, and argument heard, even though court precluded parents from testifying or cross-examining social worker].)

## B. Ineffective Assistance of Counsel

Next, mother claims that appointed counsel rendered ineffective assistance; we are not persuaded. To succeed on a claim of ineffective assistance of counsel, a parent must show: (1) counsel's representation fell below an objective standard of reasonableness for a juvenile dependency attorney; and (2) the deficiency resulted in prejudice. (*In re M.F.* (2022) 74 Cal.App.5th 86, 108–109.)

Mother asserts, without elaboration, that "Counsel suppressed witnesses, failed to investigate, failed to contact critical medical specialists, removed [mother] from the stand before testimony was completed, and demonstrated bias toward [mother] and her advocate." However, the record discloses that mother's counsel called witnesses, cross-examined other parties' witnesses, and permitted mother to take the stand herself. Mother's counsel dismissed her as a witness on July 30 after testifying for a day and a half, but mother does not explain to us why dismissing her was an error or what additional testimony she would have offered.

As for the "critical medical specialists," counsel repeatedly sought continuances for mother to develop additional evidence regarding mold. Although the court sustained objections to mother's mold report during the jurisdictional phase of the hearing, it never foreclosed mother from pursuing the theory if relevance and foundation could be established. Ultimately, however, counsel's reason for not attempting to introduce the report again is not in the record before us, and "We cannot assume that the decision was the result of negligence, when it could well have been based upon some practical or tactical decision . . . ." (*In re Arturo A.* (1992) 8 Cal.App.4th 229, 243; see

35

also *Blanton v. Womancare, Inc.* (1985) 38 Cal.3d 396, 404 [counsel "must be able to make such tactical decisions as whether to call a particular witness . . . even when the client voices opposition in open court"].)

Regardless, given the "overwhelming" evidence showing "that the results of [the] profound abuse and neglect was cruel and to inflict cruelty on this child," we fail to see how any of the asserted deficiencies resulted in prejudice to mother.[18]  As such, mother fails to show that counsel's performance was deficient or that it prejudiced mother's defense.[19]

**C. Judicial Bias**

We easily reject mother's claim of judicial bias and misconduct.  In reviewing claims of judicial bias, we must " 'determine whether the judge's behavior was so prejudicial it denied the party a fair, as opposed to a perfect, trial.' " (*In re M.V.*, *supra*, 109 Cal.App.5th at p. 517, quoting *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 589.)

In our review of the sealed and unsealed records, the presiding judge conducted herself properly and impartially throughout these proceedings.  It

---

[18] In making this determination, we note that the Legislature has not defined " 'act or acts of cruelty' (§ 300, subd. (i)) due to the myriad forms such conduct may take.  Instead, what constitutes an 'act or acts of cruelty' is a 'factual determination that the juvenile court makes based upon the common meaning of the phrase and the totality of the child's circumstances.' " (*In re N.R.* (2023) 15 Cal.5th 520, 548, quoting *In re D.C.* (2011) 195 Cal.App.4th 1010, 1017.)  As such, the only intent that is required is the intent to commit the acts, not the intent to inflict harm (including, presumably, pain or suffering).  (See *In re D.C.*, at p. 1017 [finding jurisdiction appropriate under section 300, subdivision (i), "where a parent intends to commit the act notwithstanding the absence of evidence that the parent actually intended to harm the child"].)

[19] To the extent we deem mother's appellate arguments forfeited for failing to object below, such forfeitures do not change our conclusion regarding mother's ineffective assistance claim.

appears that mother bases her claim of bias on "The judge call[ing] [mother] a liar." In reality, however, the court simply expressed, after the close of jurisdictional evidence, that mother's testimony was "not at all believable," and a court's findings on the credibility of a witness do not constitute judicial bias or misconduct. (*Schmidt v. Superior Court*, *supra*, 44 Cal.App.5th at p. 592 ["Finding a witness believable [or not believable] does not demonstrate bias. It demonstrates judgment"].) Mother also failed to raise any statutory challenges to the judge or otherwise object to any perceived misconduct below, thereby forfeiting the issue. (*Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1218 [appellants "did not preserve their claim of judicial bias for review because they did not object to the alleged improprieties and never asked the judge to correct remarks made or recuse himself"].)

### D. Evidentiary Claims

Mother also fails to demonstrate any error regarding the evidence admitted at the hearings. Juvenile courts are "vested with broad discretion" in ruling on the admissibility of evidence, and evidentiary rulings " ' "will be upset only if there is a clear showing of an abuse of discretion." ' " (*In re Cole C.*, *supra*, 174 Cal.App.4th at p. 911.) This broad discretion extends to the court's decisions on "whether to admit or exclude expert testimony." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

Mother asserts error in the "Suppression of Evidence," including the suppression of "[e]nvironmental mold testing, medical records, GI specialist notes, and expert testimony." However, except for mother's mold report, all documents offered for both jurisdictional and dispositional purposes were admitted into evidence, including the delivered service logs noting K.L.'s supposed cerebral palsy diagnosis, which the court found unpersuasive.

As for the mold report, we agree with the juvenile court that "the existence of the mold" at the family's apartment would "require testimony and foundation." Despite having the report since July 21, mother never called a mold expert or the testing company to testify. Instead, mother sought to delay the dispositional hearing so she could "vet[ ]" a "new," but unidentified, witness. Because mother offered no reason for waiting nearly three months before vetting the witness, the court did not abuse its discretion in refusing to continue the hearing. (*In re D.Y.* (2018) 26 Cal.App.5th 1044, 1056 ["continuances are discouraged in dependency cases" and reviewed for abuse of discretion].)

In any event, Merl testified that K.L.'s malnutrition was the result of "getting inadequate calories at home," not any sort of genetic condition, and that K.L. had "been starving at home for years," which caused irreversible brain damage and "really significant" developmental delays. Thus, even if mold evidence had been admitted, it is not reasonably probable that mother would have achieved a more favorable outcome. (See *In re Jordan R.* (2012) 205 Cal.App.4th 111, 134 [any error in refusal to admit polygraph test was harmless]; *In re Malick T.* (2022) 73 Cal.App.5th 1109, 1128 ["The harmless error doctrine applies in dependency cases"].)

**E. Social Worker Misconduct**

Mother's final challenge to the social worker also lacks merit. Mother claims the social worker "engaged in due process violations, withheld medical information, falsified emails, offered misleading testimony, violated ADA accommodation requirements, and engaged in perjury." None of mother's assertions finds any support in the record. Regarding medical information and testimony specifically, Merl and Parra were both cross-examined by mother's counsel, including on the issues of mold, autism, and cerebral palsy.

Mother fails to identify anywhere in the record where she requested accommodations[20] and similarly, to the extent mother claims the social worker engaged in perjury, she has forfeited that claim by failing to raise it in the juvenile court. (See § 16513.5 [permitting motion to remove a social worker for, inter alia, "perjury with regard to the dependency proceeding"].)

## DISPOSITION

Mother's petition for extraordinary writ is denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

---

[20] At oral argument, mother represented that she had requested accommodations in the form of introduction into evidence of her "wellness records" including records from her psychiatrist and therapist. Mother provided no record citations to either her request or the denial and, assuming arguendo that mother qualifies for accommodations, such requests must comply with California Rules of Court, rule 1.100 and may be denied where, as here, the request fails to "satisfy the requirements" of rule 1.100 or the accommodation "would fundamentally alter the nature of the service, program, or activity." (Cal. Rules of Court, rule 1.100(f)(1), (3).)

DESAUTELS, J.


We concur:


STEWART, P. J.


MILLER, J.


*D.H. v. Contra Costa County Superior Court; Contra Costa County Children and Family Services Bureau, RPI* (A174597)


40